MEMORANDUM OF DECISION
December 16, 1998, the Commissioner of the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Maritza T. and Ivan B., the mother and father of Luz B., born December 29, 1995 and Ivan B., born March 19, 1997. On the same date a petition also was filed to terminate the parental rights of Maritza T. and Angel R., the mother and putative father of Lynette R., born March 6, 1992. These three siblings had been in foster care for a continuous period of nineteen months prior to the date the petitions were filed. Maritza T. and Ivan B. were duly served and notified of the pendency of the petitions. However, DCF failed to effectuate and verify notice by publication in accordance with this court's order of notice and still had not properly served Angel R. as of the date of the commencement of trial. Accordingly, the allegations against Angel R. in the petition affecting Lynette R. were dismissed.[2]
The petitions, as amended, allege three statutory grounds for termination of Maritza T.'s and Ivan B.'s parental rights. General Statutes § 17a-112(c), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;" and "(B) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child; and "(D) There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be CT Page 9745 detrimental to the best interest of the child."
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment to it. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842
(1991), cert. denied 221 Conn. 901 (1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest.
Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question.State v. Anonymous, 179 Conn. 155, 172-173, 425 A.2d 939 (1979);In re: Juvenile Appeal (84-BC), 194 Conn. 252, 258, 479 A.2d 1204
(1984); In re Nicolina T., 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In EmmanuelM., 43 Conn. Sup. 108, 113, 648 A.2d 904, affd 35 Conn. App. 276,278, 648 A.2d 881, cert. denied 231 Conn. 915, 648 A.2d 151
(1994). For the reasons stated below, the court grants the petitions to terminate the parental rights of Maritza T. and Ivan B.
 I FACTUAL FINDINGS
At trial, DCF introduced seven documentary exhibits and the testimony of Eric Bumell, a DCF social worker, Dr. Richard Sadler, a licensed psychiatrist who evaluated Maritza T., and Alexandra B. Cortes, a DCF social worker. Ivan B. introduced the testimony of his mother, Ana B. Maritza T. and the children's attorney participated fully in the proceedings, but introduced no exhibits or testimony.
The credible and relevant evidence offered at trial supports the findings of the following facts by clear and convincing evidence: CT Page 9746
A. Procedural History
On May 5, 1997, petitions alleging that Lynette, Luz and Ivan were neglected were filed by DCF, along with motions for orders of temporary custody, which the court granted ex parte and subsequently sustained at a hearing on May 8, 1997. The three children have remained in foster care since that time. At the time the court sustained the orders of temporary custody, it simultaneously issued preliminary specific steps to advise both Maritza T. and Ivan B. what they might be expected to do in order to regain custody of their children. These preliminary steps are part of the court record. See General Statutes § 46b-129(b).
On December 5, 1997, all three of the children were adjudicated neglected and committed to DCF. Ivan, then incarcerated, was present. He did not ask to sign expectations. Lynette's putative father, Angel R., was whereabouts unknown and never appeared in her neglect case. Written expectations were set for Maritza and approved by the court as follows on the date of the commitments:
(1) Keep all appointments set by or with DCF and keep your whereabouts known to DCF and your attorney at all times;
(2) Visit the child[ren] as often as DCF permits; (Maritza was required to call the DCF worker before visits at least three hours in advance to inform whether or not she would attend.)
(3) Participate in parenting and individual counseling; (The individual counseling was required if a psychiatric evaluation, to which Maritza agreed, recommended it.)
(4) Secure and maintain adequate housing and income;
(5) No substance abuse; and
(6) No involvement with criminal justice system.
The written expectations form was signed by Maritza, her attorney and the children's attorney on December 5, 1997. This form included the following written advisement:
"If you fulfill the court's expectations, you will improve your chances of regaining, or keeping, guardianship of your child permanently. Failure to achieve these goals will CT Page 9747 increase the chance that a petition may be filed to terminate you parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker.
On November 17, 1998, DCF's petitions for extension of the children's commitments were granted. After extending the commitments, the court found that DCF had made reasonable efforts to reunify the family, but that continued efforts toward reunification were no longer appropriate. The court noted DCF's intention to file termination petitions as the permanency plan and ordered they be filed within thirty days. Ivan was still incarcerated and Maritza had not complied with any of her expectations. She had not visited any of the children in over seven months.
B. Mother. Maritza T.
Maritza T. is a 27-year-old mother of three children. She is reported to be the 9th child born to her own mother. She has a ninth grade education and a sparse employment record. She is not known to have abused substances and has no criminal record. DCF first became involved with Maritza and her three children in August of 1996 with a referral to DCF from a Betty Soto, an outreach workerfor new and expectant mothers, who reported that Maritza appeared depressed and was not providing adequate food for her middle child, Luz, then an infant of eight months. Maritza was feeding Luz iced tea from a dirty bottle and had no clothing for the baby. There was no stove in the apartment and no electricity. Garbage bags in the kitchen were covered with insect larvae. A subsequent referral alleging neglect was received by DCF on October 31, 1996, reporting drug use in the home and a lack of food. DCF substantiated these concerns, and Maritza agreed to accept DCF services on a voluntary basis in an attempt to preserve the family.
On November 4, 1996, a parent aide reported mother and children were doing fine, but on December 10, 1996, Maritza was evicted from her apartment and moved in with Ana B., Ivan's mother. Maritza was now pregnant with Ivan, but did not report this to DCF and sought no prenatal care. A family member reported to DCF that mother was depressed and staying in bed all day. She also became angry when Luz cried. DCF substantiated this report.
On January 17, 1997, a home visit by DCF revealed mother had CT Page 9748 no milk for the children. On January 31, 1997, a nurse practitioner at St. Francis Hospital reported that Luz was falling below the 5th percentile on the infant growth chart for height and weight and that Maritza giggled when confronted with this serious health concern.
In April of 1997, Maritza refused to accept the Birth to Three Program which had been recommended for Luz. On April 14, 1997, another referral by Soto reported that baby Ivan was not feeding well and that Maritza was propping his bottle and leaving him alone to feed. On April 21, 1997, there was no formula or milk in the home and Maritza had no plan for obtaining any. On this date, Maritza also was observed by the DCF worker to be watching T.V., her face only 10 inches from the screen, while holding baby Ivan listlessly. Luz was in a playpen with no toys, and Lynette was walking all about the apartment without supervision. Luz appeared poorly responsive, displayed a white coating on her tongue and was gasping for air due to nasal congestion. When Luz began to cry and the DCF worker went to pick her up, Maritza told her to leave the baby in the playpen. Maritza continued to stare at the T.V. On May 1, 1997, Maritza again had no formula for the infant Ivan and the electricity in the apartment was turned off. DCF removed the children from the home and orders of temporary custody were obtained on May 5, 1997.
From May 1, 1997, when the children were placed in the care of DCF, until November 1998, Maritza visited her children on only eleven occasions. She often arrived over half an hour late. During her last visit with the children on April 29, 1998 at Goodwin Park in Hartford, Maritza interacted poorly with her children. She only spoke to them when they approached her. She took no initiative to engage her children in conversation nor did she inquire as to the children's well-being. She seemed distant during the entire visit. Since the time the children entered foster care, Maritza has sent them no cards, letters or gifts, nor has she telephoned DCF or the foster home to inquire as to their welfare. Her employment history, which is rather sketchy, never resulted in her providing any support for her children.
On December 19, 1997 and June 15, 1998, Maritza signed treatment plans agreeing to follow through with expectations set by the court on May 8, 1997 and December 5, 1997. Since Dr. Richard Meier, a licensed psychologist, who had evaluated Maritza in November of 1997 considered her intellectually limited, the CT Page 9749 DCF treatment worker, Eric Burnell, took great pains to speak to Maritza on a concrete basis, in both English and Spanish. Burnell was careful to write out what was expected and then explain it in both languages. He took pains to make Maritza aware of the probable consequences of not following through with expectations. He would repeat instructions and warnings at the end of every one of her visits.
Since its involvement in 1996, DCF referred Maritza to the St. Francis Parent Aide program, the Birth to Three program, individual counseling and parent training at the Insitute for Hispanic Families, job training through the Community Renewal Team Jobs First program, and individual counseling through the Village for Families and Children, but Maritza refused these services. Burnell prepared her for referral appointments and offered her transportation. When he was advised by a particular agency that Maritza failed to keep an appointment, he would contact her and urge her future attendance. Despite these efforts, Bumell invariably was unable to provoke any cooperation or compliance on her part.
Maritza has failed to follow through with most of her expectations. She has not participated in any form of counseling, has not secured and maintained adequate housing and income and continues to rely on friends and relatives for housing. She has failed to visit her children consistently.
Pursuant to court order, Dr. Meier evaluated Maritza and her interaction with the three children on November 5, 1997. In describing her background to Meier, Maritza denied any major problems while she was growing up in Puerto Rico and denied that there were any major family difficulties. She met Ivan when she was fourteen years old and lived with him for a while but separated for reasons she refused to disclose. She indicated that Ivan used to hit Lynette, but not Luz. Ivan was incarcerated after Maritza became pregnant with little Ivan.
Maritza completed the ninth grade with average grades. She had no real difficulties in school and was not in special education. She denied any medical problems or substance abuse and has no criminal record. She has only worked briefly and sporadically.
Maritza was vague with Meier on how DCF became involved with her family. She believed it may have been upon the complaint of a CT Page 9750 neighbor or an outreach worker from a clinic. She denied knowing what she needed to do to have her children returned, stating she had never been given anything in writing explaining what she was expected to do. She minimized her lack of food and adequate housing for the children. She explained her lack of visits with them by stating she was at her grandmother's or sleeping.
Meier feels Maritza had "little insight into the problems facing the family." She was overly critical of Lynette, telling Meier that Lynette was overly tense and cries too easily. She states that Lynette needs too much affection, has few friends, is demanding, and does not respond to punishment. When Meier observed Maritza interact with the three children, she held Ivan and played with him while Luz sat by herself, receiving little attention from her mother. When Meier urged her to interact with all the children, the session did not improve. Most of the interaction had to be initiated by the children. Luz got the least amount of attention, being quiet and less demanding. Only Lynette showed any attachment to her mother.
Meier concluded in his written evaluation in late 1997 that mother should have a psychiatric evaluation. He noted concerns about her significant level of emotional distress and lack of comprehension. Maritza presented with a "very flat affect" and seemed socially withdrawn and introverted. Despite this evidence of significant emotional, behavioral and cognitive problems, Maritza told Meier she did not see any need for supportive services or treatment. Meier stated this would make it difficult to work with her since she will not acknowledge any problems and sees no need to seek treatment. Meier recommended treatment for Maritza's "possible depression", followed by a reassessment of her motivation for reunification. Also of concern to Meier was the limited family support. Meier recommended that the children not be returned to Maritza until she could address her own problems with psychotherapy. He suggested that her expectations should be written and precisely explained to her.
Meier also noted in his conclusion that all three of the children needed to be carefully monitored and evaluated with regard to possible cognitive problems or learning disabilities. They would likely need early intervention programs.
Following up on Meier's suggestion, a psychiatric evaluation of Maritza by Dr. Richard Sadler, a psychiatrist, was arranged. This evaluation, which is in evidence, was performed on February CT Page 9751 15, 1998. Sadler also testified at trial. He found that Maritza demonstrated intellectual abilities within the borderline range, but demonstrated no symptoms of a psychotic or depressive disorder. He saw no signs of any significant psychiatric impairment.
Sadler found Maritza acutely unaware of her impaired parenting ability. She did not recognize any significance to Luz falling off of her growth curve, and did not consider feeding an infant sugar water and iced tea to be other than an emergency measure when she did not have milk or formula. She seemed concerned and cognizant of the children's needs, but had no idea as to what to do. Of great clinical concern to Sadler was Maritza' s refusal of offered services. Sadler's conclusion was that Maritza could identify problems, but was passive and unwilling to address them to provide for her children's welfare. Her false pride and passivity combine to produce a situation where she is unable to address their needs. "When Ms. T. is overwhelmed, her impaired abilities are further impaired by her withdrawal into immobility." Sadler found no specific psychiatric impairment or significant depressive disorder to account for her impairments.
Sadler does not consider Maritza capable of caring for her children without significant structure and support withing a setting that included other persons to advise, direct, organize and coach her to give her children the care they require for appropriate development. Unfortunately, there is no evidence that any of her extended family would be capable of such an overreaching task. Sadler notes significant external support from the state would also be necessary. However, for over two years, Maritza has steadfastly declined any form of assistance.
The most disconcerting aspect of Sadler's testimony is that Maritza, while somewhat intellectually limited, has sufficient mental and emotional ability to reasonably parent, but just chooses not to seek help or accept services, to the severe detriment of her children. She can follow directions and instructions. Sadler opined that the only way to modify whatever personality attributes prevent her from accepting help would be a coercive program, which may not even prove successful. Short of confining Maritza and forcing her to accept services, Sadler held out very little hope for improvement within a reasonable period of time. CT Page 9752
C. Father of Luz and Ivan, Ivan B
Ivan B. is now 20 years old. He was 16 when Luz was born, and only 17 when Ivan was born. He has just a ninth grade education. Although he has held a few jobs, there is no evidence he ever supported his two children. He was incarcerated for violation of probation and possession with intent to sell on January 17, 1997, after DCF had already become involved with providing help to the family, so he should have been aware of the substandard conditions to which Luz was being exposed. When the children were removed in May of 1997, Ivan's mother, Ana B., was considered as a possible relative placement for them, but DCF determined her home was inappropriate and all of the children were placed with non-relatives. Neither Ivan nor his mother appealed DCF's decision not to license her. Ana B. has not maintained contact with the children over the past few years. She visited them once, although Burnell advised her she could accompany Maritza on her visits.
Subsequent to the children's removal from Maritza in May of 1997, Ivan did request that Luz and Ivan be transported to the Manson Correctional Facility for visits with him. However, in 1997, DCF declined to bring the children since he had no real relationship with either of them and visits had to occur behind a pane of glass, over a telephone, as he was deemed a maximum security risk. This sort of "visit" was deemed entirely futile and inappropriate by DCF for an infant and a two-year-old. Neither Ivan nor his attorney sought to appeal DCF's refusal to provide him with these limited visits to either the agency or the court. Ivan sent cards and pictures to each of the children on about three occasions.
Ivan could have attended educational, anger management and parenting classes while incarcerated, but there is no evidence he completed any programs. When the children were committed, he did not contest the neglect allegations and sought no expectations for himself. Upon his release from jail two months prior to the termination trial, he made no effort to contact DCF to inquire about the children or ask for visits. There is little evidence of of Ivan's involvement with, or advocacy on behalf of his children; although some of his female relatives did try to help Maritza out. While he was understandably very young to parent two children, his response to the obviously inadequate care by Maritza appears to have been reliance upon his female relatives. During trial, he did not argue that he be given an opportunity to CT Page 9753 assume custody and care of his children; instead, he proposed they be adopted by his mother, who, after two years, has no connection with them and has been deemed unsuitable as a placement. At the very least, Ivan, albeit incarcerated, could have worked on a viable plan in a more timely fashion, and made greater efforts at entreating either Maritza or one of his other relatives to work with the department and address its concerns as to neglect and the need for service interventions.
D. The Children
Lynette, Luz and little Ivan continue to live in DCF licensed foster homes. Lynette has lived with the same foster family since her initial placement and has adjusted well to this home. On August 10, 1998, Luz was removed from her prior foster home in Bristol and placed with her sister as a result of substantiated neglect in her former foster home. She has adjusted very well. Ivan was moved to a new foster home on November 4, 1998 at the request of his former foster family. He is receiving Birth to Three services and is developing rapidly, seemingly more content with his new foster family.
Lynette has negative memories of her mother attributable to her cognizance that mother has not visited her regularly. Ivan and Luz have no present memories of either of their parents as they were both very young when removed from home. When being transported for visits, Luz would cry all the way from the foster home and back. Interactions observed by Burnell and Meier revealed Maritza's inability to engage appropriately. Maritza would ignore Luz and Lynette and focus on Ivan, even when he was asleep. Lynette would attempt, usually unsuccessfully, to engage her mother. Luz, who failed to recognize her mother after a series of missed visitations, would play quietly alone and make no effort to seek comfort or affection from her. Ivan and Luz have already been in several placements; all three of the children have bonded well with their present foster homes. They never inquire as to the whereabouts or welfare of either parent.
 II ADJUDICATION
Each statutory basis set out in General Statutes Sec. 17a-112
(b) is an independent ground for termination. In re Baby Girl B.,224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to CT Page 9754 prove one or more of the three grounds alleged in its petition by clear and convincing evidence.
A. Abandonment — General Statutes 17a-112(c)(A)
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. Sporadic efforts are insufficient to negate the claim of abandonment. The test for determining abandonment of a child for purposes of termination of parental rights is not whether a parent has shown "some interest" in his or her child, but rather, whether the parent has maintained any reasonable degree of interest, concern or responsibility as to the children's welfare. In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987).
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M.,6 Conn. App. 194, 209, 504 A.2d 533 (1986). From the children's date of placement in April of 1991 to February 21, 1995, the respondents failed to maintain consistent visits or to have any regular, meaningful personal interaction their children.
Since her three children were removed from her care in May of 1997, Maritza has failed to provide them with any support. She has not sent them any cards, gifts or letters, and her visitation was sporadic. She had to be prompted to call ahead before she attended visits because the children were being transported only to be disappointed when their mother did not appear. During visits with the children, Maritza remained passive, making little effort to show affection or interact with them in a meaningful and appropriate manner. Her last visit with the children was in April of 1998, almost nine months before the termination petitions were filed.
When contacted by DCF workers to encourage her acceptance of services to which she had agreed in writing, both before and after the children were removed, Maritza was noncommittal and uncooperative. Her contacts with the DCF social workers rarely included the expression of any concern or inquiry into the welfare of her children. Although referred for educational and job training programs which would have assisted her in at least securing adequate housing and income, she did not follow through CT Page 9755 with any classes or training programs. Rarely has this court seen so little effort put forth by a parent who has not simply disappeared.
According to Maritza, she had little relationship with Ivan after the birth of Luz. He was not incarcerated when Maritza became pregnant with Ivan, and he should have been aware of mother's parenting and shelter deficiencies. While he was still in the community Maritza and the children had to move into his mother's home subsequent to being evicted. Rather than acting in a responsible fashion, by seeking employment to help support Luz and the expected baby, Ivan, or by intervening and offering to assist Maritza more with Luz' care, Ivan recklessly engaged in further criminal acts and violated his probation, resulting in his incarceration for the next two years. He sent a few cards to the children while incarcerated, but maintained no consistent contact with them, DCF or the foster care providers. He didn't bother to benefit from courses offered in the correctional institution which would have improved his own parenting skills; in fact, even at the time of the termination trial, his "plan" for caring for his children was to propose his mother adopt them.[3]
Ivan never asked for services or guidance from DCF or the court as to how he might acquire custody and did not pursue visitation rights, although represented by counsel, when DCF refused to transport his two small children to a maximum security prison. His entire approach to his children has been to abdicate his own responsibility and rely on others to parent them for him, despite their questionable abilities as caretakers.
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted. In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993); In re Roshawn R., 51 Conn. App. 44, 53, 720 A.2d 1112 (1998).
Statutory abandonment on the part of both Maritza and Ivan CT Page 9756 has been proven by clear and convincing evidence. Each has failed to display the minimal attributes of parental obligation. Neither has manifested a consistent, prolonged and reasonable degree of affection, interest, concern or responsibility as to their children's welfare. In re Rayna M., 13 Conn. App. 23, 37 38,534 A.2d 897 (1987); In re Michael M., 29 Conn. App. 112, 121-123,614 A.2d 832 (1992).
B. Failure to Rehabilitate — General Statutes 17a-112(c)(B)
If the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fail to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child, grounds for termination exist. General Statutes Section 17a-112(b)(2).
The evidence is clear and convincing that prior to the filing of the termination petitions, Lynette, Luz and Ivan were adjudicated neglected and uncared for and committed to DCF on December 5, 1997. They were recommitted effective December 5, 1998. At the time of the extension of the commitments, the court found efforts toward reunification with either parent were no longer appropriate.
Personal rehabilitation, as used in the statute, refers to the restoration of a respondent to a constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986). The parent's compliance with expectations set after the adjudication of the neglect or uncared for case or the parent's success in fulfilling service agreements entered into with DCF are relevant, but not dispositive, to the rehabilitation finding. In re Luis C., 210 Conn. 157, 167-168. 554 A.2d 722
(1989). The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than he or she was at the time of the commitment. In re Michael M., 29 Conn. App. 112, 126,614 A.2d 832 (1992).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. In re Luis C., supra, 210 Conn. 167. The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. InCT Page 9757re Davon M., 16 Conn. App. 693, 696, 548 A.2d 1350 (1988). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M., 19 Conn. App. 371, 377,562 A.2d 566 (1989).
During the months that elapsed after the children's initial placement in foster care prior to the adjudication date, Maritza made no effort to secure income and adequate housing, rarely visited or inquired about her children, and refused all recommended counseling and reunification services. She complied with none of the court expectations she agreed to in December of 1997. She has proposed no alternative, coherent plan to resume parenting. She has no job, no high school diploma and continues to live by relying on the generosity of relatives and friends.
Both evaluators, Meier and Sadler, opined that unless Maritza first consents to counseling, efforts at improving her parenting skills will be ineffective. In Sadler's opinion, Maritza will have to be coerced into accepting services, but the court is at a loss to assess what is more coercive in the context of a civil matter than to face the consequence of the loss of one's parental rights, which has had no discernible effect on Maritza's motivation.
Given Sadler's pessimistic prognosis for mother's acquiring adequate parenting skills in the reasonably near future, and in light of the fact that the children have already spent over two years m foster care, there is no hope that within a reasonably acceptable period, Lynette, Luz and Ivan could possibly return home to a stable, permanent and nurturing environment with their mother. The risk of prolonging an alternative permanency plan and waiting in this case, given this mother's history of noncompliance with almost every single expectation, is not worth taking. It should be stressed that neither expert opined that Maritza is so severely limited she is incapable of acquiring adequate coping and parenting skills. She can follow instructions, and in the past, community outreach workers had some limited success when working with her, although Maritza failed to remain consistent in her care of the children. There is no excuse for mother's longstanding lack of cooperation and disinclination to love and nurture her children.
Ivan, recently released from a period of incarceration that CT Page 9758 extended over two years, paid little attention to Luz' condition prior to his confinement. He chose not to contest DCF' s refusal to allow Luz and Ivan to visit him in prison, and he presented no proof that he completed any programs available to him while incarcerated that could have improved his attitude, level of education or parenting abilities and discouraged his criminal proclivities. In fact, the only evidence he offered at trial was irrelevant to the issue of whether or not he had rehabilitated or could sufficiently rehabilitate as a parent within a reasonable time. He proposed a plan that the court order DCF to place his children with his mother and let her adopt them. It is abundantly clear Ivan chose, and continues to choose not to assume real parental responsibility for Luz and Ivan.
The evidence in this case is clear and convincing that Maritza and Ivan, as of the date of the filing of the termination petitions, had not achieved a reasonable degree of rehabilitation and there is no evidence of conduct prior or subsequent to the date of the filing of the petition which would encourage the belief that within a reasonable period of time, considering the ages and special needs of their children and the length of time they have spent in foster care, either of them could assume a responsible position in their children's lives.
C. No Ongoing Parent-Child Relationship — General Statutes17a-112(c)(D)
This ground alleged by the petitioner requires proof, by clear and convincing evidence, that there is no ongoing parent-child relationship, which means "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
This statutory definition, as it has been interpreted in case law, requires a finding that "no positive emotional aspects of the relationship survive." In re Jessica M., 217 Conn. 459, 470,586 A.2d 597 (1991). It "is inherently ambiguous when applied to noncustodial parents who must maintain their relationship with their children through visitation." Id., 459; In re Valerie D.,223 Conn. 492, 531, 613 A.2d 748 (1992). Although the ultimate question is usually whether the child has no present memories or feelings for the natural parent, the existence of a loving CT Page 9759 relationship or a "psychological parent" relationship with one other than the natural parent does not, of itself, establish the no ongoing parent-child relationship ground for termination. Inre Jessica M., supra, 473475.
Unlike the other nonconsensual grounds to terminate parental rights, the absence of a parent-child relationship is considered a "no fault" ground for termination.
To establish this ground requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists; and second, the court must look to the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. The absence of a parent-child relationship can be demonstrated in situations where a child has never known his or her parents so that no relationship ever developed between them, or where the child has lost that relationship so that despite its former existence, it has now been completely displaced. In re Juvenile Appeal (Anonymous)177 Conn. 648, 670, 420 A.2d 875 (1979).
Judicial interpretation has imposed a requirement that a child have "present memories or feelings" for the parent, and "at least some aspects of these memories and feelings are positive" to overcome this ground. In re Jessica M., supra, 217 Conn. 475;In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709,483 A.2d 1101, cert. denied, 195 Conn. 801 (1984). The existence of positive feelings usually depends on the viewpoint of the child.In re Rayna M., 13 Conn. App. 23, 35, 534 A.2d 897 (1987).
The mere fact that there has been some minimal contact between the parent and the child does not preclude a determination that there is no ongoing parent-child relationship.In re Juvenile Appeal (Anonymous), supra, 177 Conn. 638.
The court finds that the petitioner has established, by clear and convincing evidence, the alleged statutory ground of no ongoing parent-child relationship with respect to the Maritza and Ivan. Luz and Ivan have no positive memories or feelings for either parent. There is no evidence that Ivan had a parent-child relationship with Luz prior to his confinement. Lynette did display a bond with her mother, but her mother's lack of attentiveness during the visits, and her failure to consistently visit, have left Lynette with negative feelings toward Maritza. CT Page 9760 The record is also devoid of any evidence to suggest any possible benefit to the children to await the remote chance that either Maritza or Ivan will do what would be required to restore either of them to a useful role as a parent. The court finds, by clear and convincing evidence, that to allow for further time to establish or reestablish a parent-child relationship would be detrimental to the children's best interests. They have been in foster care for too long for children so young, and permanency plans need to be implemented immediately.
 III DISPOSITION
A. Section 17a-112 (e) Criteria
The court has found by clear and convincing evidence that all of the statutory grounds alleged by the petitioner for the termination of Maritza T.'s and Ivan B.'s parental rights have been proven. Before making a decision whether or not to terminate respondents' parental rights, the court must now consider and make findings on each of the seven criteria set forth in Sec.17a-112(e). In re Romance M., 229 Conn. 345, 355, 641 A.2d 378
(1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
Based on the foregoing discussion, the court finds that DCF provided preservation services, thenfoster care for the children. Treatment workers offered the mother assistance with visitation, transportation, parenting and job training skills and individual counseling. DCF was justified in refusing to transport the children for meaningless visits to father's maximum security correctional facility. Other services could not be provided while father was incarcerated. However, there were relevant programs Ivan could have benefitted [benefited] from while in jail and he did not do so. CT Page 9761
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
The court finds by clear and convincing evidence that DCF made reasonable efforts to promote reunification of the children with Maritza and Ivan, to the extent possible after his own volitional act resulted in his incarceration for over two years. Throughout 1996, prior to Ivan's confinement, DCF was offering services to preserve the family and prevent removal of the children, but there is no evidence that Ivan showed any interest in cooperating with DCF and assisting Maritza in accepting help at that time. On November 17, 1998, when the children had spent over 18 months in foster care, the court found that efforts toward reunification with either Maritza T. or Ivan B. were no longer appropriate.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations.
Expectations were never entered into or agreed upon by Ivan B., although he was present in court and represented by counsel at the time of his children's initial neglect commitments. Maritza agreed to and signed expectations on December 5, 1997, which were approved by the court. DCF offered her the recommended services and sought to promote increased visitation at her request. As described more fully in this decision at pages 5-7, Maritza has failed to comply with almost all of her expectations.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
Lynette R. has little if any positive feelings toward her mother. The other two children don't even remember their parents. None of the children ask about their mother or father. Lynette is the only child who has been with her foster parent for more than one year, and she appears bonded with and has significant emotional ties to her. Luz and Ivan have adjusted well to their recent foster placements.
(5) "The ages of the children." CT Page 9762
Lynette is 7; Luz is 3 1/2 and Ivan is 2.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Ivan and Maritza have maintained no consistent show of concern or interest in their respective children, not only subsequent to, but prior to their removal from the home. They have failed to regularly contact the children, DCF or the foster parents. Maritza maintained a sporadic, inconsistent visitation schedule and stopped attending visits months before these petitions were filed. Ivan did little to press for visits after DCF denied them. There is no evidence either Maritza or Ivan contributed any support to these children. Neither parent has made serious, prolonged or sustained efforts to reunify with the children. They are nowhere close to achieving the level of personal rehabilitation necessary to effectively provide and care for them.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is nothing in the record, including economic or institutional conduct or circumstances, to suggest that these parents have been prevented from maintaining or establishing a meaningful relationship with the children. Since the time of the children's removal, both were offered the assistance of counsel at state expense. Mother was offered assistance and services, which, if availed, would have promoted reunification. Father's efforts toward reunification were thwarted by his own decision to commit a criminal act while already on probation.
B. Best Interests of the Children
CT Page 9763
The court must now address the issue of whether the termination of parental rights is in the best interests of the three children. This is part of the dispositional phase of a termination proceeding. In re Valerie D., supra, 223 Conn. 511.
Permanency, consistency and stability are crucial for these children. Ivan and Luz may have developmental delays which will require consistent, responsible attention. These two have already endured several changes in placement. Surprisingly, they have proven remarkably resilient and have adjusted well to their current placements. Maritza has steadfastly maintained an audacious and persistent indifference to the plight of her children, and Ivan has consistently failed to assume a responsible parental role. After considering the children's sense of time, their need for a secure and permanent environment, the need to avoid future disrupted placements, the relationship the children have with their foster parents, the lack of relationship the children have with Maritza and Ivan, and the totality of circumstances occurring since 1996, the court concludes that termination of parental rights is in the children's best interests.
 CONCLUSION
Based upon the foregoing findings, and having considered all of the evidence and the exhibits, the testimony of the witnesses, as well as the comments of counsel, the court concludes that the evidence is clear and convincing that it is in the best interests of Lynette R. that the parental rights of Maritza T. be terminated. Further, it is in the best interests of Luz B. and Ivan B. that the parental rights of Maritza T. and Ivan B. be terminated.
The petitions are granted and judgments may enter terminating the respondents' parental rights. Pursuant to General Statutes § 17a-112(h), it is ordered that DCF be appointed statutory parent for Luz B. and Ivan B. DCF is to report to the court within ninety days on a case plan for Luz B. and Ivan B. and submit reports at least every six months thereafter until such time as any proposed plan has been implemented. Forward movement on a permanency plan for Lynette will have to await the outcome of the pending termination of parental rights petition now pending against her putative father, Angel R., whose whereabouts have been unknown for years. The court will endeavor to expedite CT Page 9764 that proceeding provided DCF finally cooperates in securing valid notice by publication. For now, the missing Angel R. remains Lynette's sole "parent." General Statutes § 17a-112(g).
KELLER, J.
[2] DCF was ordered to refile a petition to terminate Angel R.'s parental rights to Lynette by July 2, 1999. That matter is now pending.
[3] When Ana B. testified for Ivan, she noted that she was already caring for another one of her grandsons, the son of one of Ivan's brothers. She noted that the brother was getting married and had moved out of her place, but he had decided to let her "keep" the grandson, who had lived with Ana B. most of his life. Ivan's brother reasoned to Ana that he could always have another baby. This is the cavalier attitude exhibited by many so-called "fathers" in today's "me first" society: children are treated like puppies — why not give them away when they become inconvenient and end your responsibility?